# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TINA BAKER,

    *Plaintiff*,

    v.

CT TRANSIT,

    *Defendant*.

No. 3:18-cv-01534-MPS

## RULING ON MOTION FOR SUMMARY JUDGMENT

Tina Baker brings this action against her former employer, CT Transit of Hartford, Connecticut ("CT Transit"), alleging that CT Transit discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.* ECF No. 40 ¶ 1. Baker, who was terminated after she allegedly made improper use of her cell phone, claims that CT Transit treated her "differently" and enforced its personnel policies against her "more harshly" because she is African American. *Id.* ¶ 13-14. CT Transit moves for summary judgment on all of Baker's claims. For the reasons set forth below, I grant CT Transit's motion for summary judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits.[1] All facts are undisputed unless otherwise indicated.

---

[1] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." This Court is "under no 'obligation . . . to perform an independent review of the record to find proof of a factual dispute' if the non-moving party fails to designate specific facts showing a genuine dispute of material fact. *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (citations omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d

1

CT Transit is a company that "provides public transportation services throughout Connecticut." CT Transit's Local Rule 56(a)1 Statement, ECF No. 65-1 ¶ 2. Tina Baker was hired in 1998 by CT Transit as a bus operator. *Id.* ¶ 3. She "identifies by race as African American." *Id.* ¶ 1. Baker "had several disciplinary issues over the course of many years for various performance or rules violation[s]." *Id.* ¶ 4. But she was not terminated until February 2017, *id.*, when she was terminated for allegedly violating CT Transit's Cell Phone and Electronic/Wireless Device Policy ("Policy"), *id.* ¶ 17. Baker has never challenged any of CT Transit's prior disciplinary actions "as being discriminatory based on her race." Baker's Local Rule 56(a)2 Statement, ECF No. 65-1 ¶ 5. Baker does, however, dispute that she was terminated for violating the Policy, claiming that she was disciplined more harshly than non-African Americans and "was terminated because of her race." *Id.* at 7 ¶ 25.

## A.    CT Transit's Cell Phone Policy

The Policy applied to all bus operators. ECF No. 65-1 ¶ 6. From October 26, 2015 on, the Policy provided in relevant part that:

> Failure to adhere to any of the following bullet points shall result in a violation of the policy; **Phones are to remain off at all times!** Phones should **NOT** be on silent nor on vibrate but rather completely turned *OFF*. An operator should not know when someone is trying to call him or her. **Phones can ONLY be used at end-of-the-line layovers or any downtown scheduled layover of more than 5 minutes!** Operators shouldn't be stopping at random bus stops simply to use their phone, especially if they're running late.
> **Passengers take priority!** No matter where an operator is on their route, before he or she uses their cell phone, passengers' needs must be taken care of first and foremost.
> **Cell phones and electronic devices are not to be used in the Driver's Seat** or anywhere near the driver's compartment. Out of the driver's compartment area means either behind the white line or step off the bus. This includes blue-tooth's in the driver's seat and/or around the driver's compartment areas as well.

---

Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment").

**Smart Watches . . . [l]ike the cell phone . . . must be powered off and stowed (place out of sight and not on your person) while the Operator is operating a company vehicle.**

*Id.* ¶ 7 (formatting in original). Under the Policy, a bus operator who violates the Policy for the first time will receive a ten-day suspension and a final warning. *Id.* A bus operator who violates the Policy a second time will be terminated. *Id.* "There is no discretion under the cell phone policy concerning the discipline of bus operators for violations of the cell phone policy." ECF No. 65-1 ¶ 4; ECF No. 65-5 at 2 (supervisor who terminated Baker agreeing that he "had no discretion in giving a first-time violator of that policy anything other than a 10-day suspension").[2] The Policy was distributed to all bus operators, including Baker, who was aware of the Policy. ECF No. 65-1 ¶¶ 8-9.

CT Transit disciplines employees in accordance with "the principle of progressive discipline and informs employees about expected standards of conduct and standardized penalties that may be imposed for violations of rules and regulations." ECF No. 65-1 ¶ 2; ECF No. 65-6 at 3. "[A]s a general rule," bus operators "are supposed to have the same penalties for violating the same policies." ECF No. 65-3 at 10.

**B.    Baker's Suspension**

On November 11, 2016, Baker was seen "with a cell phone in her hand while [she] [wa]s seated in the driver's seat of the bus with a passenger coming on board." ECF No. 65-1 ¶ 13; ECF No. 62-8 at 3-4 (pictures of this event). Shortly after this event, CT Transit gave Baker a 10-day first-offense suspension, writing in a suspension notice that Baker was suspended for using her "cell phone while operating a vehicle in revenue service" in violation of the Policy.

---

[2] I cite ECF page numbers throughout this ruling.

ECF No. 66 at 10.[3] The suspension notice is dated November 28, 2016 and was signed by Baker

on that date. *Id.* The written suspension notice "reiterated the Cell Phone Policy" and was

"reviewed with [Baker] in November of 2016." ECF No. 65-1 ¶ 14; ECF No. 66 at 10

(suspension notice excerpting portions of the Policy). Baker did not submit anything contesting

the suspension notice. ECF No. 62-2 ¶ 15; ECF No. 65-1 ¶ 15 (Baker denying without

evidentiary citation, thus admitting); ECF No. 62-3 at 65 (during Baker's deposition, she

answered "I don't think so. I don't recall" when asked whether she submitted "anything in writing

responding to [the notice]" and that she doesn't recall filing a grievance about the final warning).

Baker reviewed the Policy when she received the notice of suspension and was on notice that if

she violated the Policy again she would be subject to termination. *Id.* at 66.[4]

## C.      Baker's Termination

On February 1, 2017, Baker was operating a bus for CT Transit. ECF No. 62-3 at 35.

While doing so, she stopped "[a]t a red light," *id.* at 69, and removed her phone from her pocket

---

[3] In her Local Rule 56(a)2 statement, Baker denied without citation the portions of CT Transit's Local Rule 56(a)1 statement that cited the suspension notice given to Baker because CT Transit mistakenly failed to file the suspension notice with its motion for summary judgment. ECF No. 65-1 ¶¶14-15. CT Transit cured that mistake by providing the suspension notice with its reply brief. ECF No. 66 at 10. And these portions of CT Transit's Local Rule 56(a)1 statement were supported by other admissible evidence. *E.g.*, ECF No. 62-2 ¶ 14 (citing the suspension notice, deposition testimony from two different witnesses, and an affidavit). Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Baker wrote only that she denied CT Transit's statements of fact related to the suspension notice because CT Transit "has not submitted [the notice]." ECF No. 65-1 ¶¶ 14-15. This is not a sufficient denial under Local Rule 56(a)3. Because CT Transit's assertions of fact that cited Baker's suspension notice were supported by other admissible evidence, CT Transit provided the suspension notice with its reply brief, and Baker failed to comply with Local Rule 56(a)3 in her denials, Baker has failed to establish that these facts are disputed.

[4] CT Transit also claims that "Plaintiff admits she received the Suspension/Final Warning in November 2016 for violating the Cell Phone policy." ECF No. 62-2 ¶ 16. The evidence CT Transit cites for this claim is the suspension notice and Baker's deposition transcript. *See id.* But the suspension notice does not contain any indication that Baker admitted to violating the policy; Baker just signed acknowledging that she had "read, underst[ood] and acknowledg[ed] receipt of this letter" but "[s]igning does not mean that the employee necessarily agrees with the charges and/or disciplinary action." ECF No. 66 at 10. And the citation of Baker's deposition supports that Baker read and understood the suspension notice and acknowledged that if CT Transit believed she violated the Policy again she "would be subject to termination," but it contains no admission that she received the suspension notice for violating the Policy. *See* ECF No. 62-3 at 65-66. CT Transit has not established that the reason for Baker's suspension is undisputed.

such that she "had it in [her] hand at the light" while "[t]he bus was not moving," *id*, so that she could "turn[] it off" because her "alarm went off*," id.* at 36.[5] CT Transit claims that these events are fairly described as Baker "using her cell phone while driving the bus." ECF No. 62-2 ¶ 19. Baker claims that she "did not use the cell phone but rather took the cell phone out of her pocket to turn it off and [she] did not look at her cell phone or turn if off while she was driving the bus." ECF No. 65-1 ¶ 19. Baker cites her own deposition testimony to support this claim, but at her deposition she testified that she "looked down at" her phone and that, although she "was not driving the bus when [she] took it out to turn it off," she was in the driver's seat while the bus was at a red light with passengers on board. ECF No. 62-3 at 36, 68. And Baker admitted that "she should not have taken the phone out of her pocket." ECF No. 65-1 ¶ 23; ECF No. 62-3 at 70.

CT Transit reviewed video footage from Baker's bus that showed her taking her cell phone out of her pocket while she was in the driver's seat of the bus on February 1, 2017. ECF No. 62-2 ¶ 19; ECF No. 65-1 ¶ 19 (Baker denying she used the phone but failing to deny that she held the phone or that CT Transit reviewed footage of Baker holding the phone). After this footage was reviewed, Baker was investigated for cell phone use, ECF No. 65-1 ¶ 19, and then terminated, *id.* ¶ 17. Her termination was documented in a discharge memorandum that stated Baker was terminated because "[u]pon review of the on-board video, you were found to have been using your cell phone while en route to Port Chester" in violation of the Policy. ECF No. 62-10 at 2. Baker does not recall whether there was "any discussion about discrimination" when

---

[5] Baker denies CT Transit's description of how she interacted with her cell phone but fails to cite admissible evidence that contradicts CT Transit's description of events, which is supported by admissible evidence. *See, e.g.,* ECF No. 65-1 ¶ 20. And some of the documents Baker cites in her denial support the description CT Transit provided in its Local Rule 56(a)1 Statement. *See, e.g., id.* (citing page 34 of Baker's deposition when denying that she looked at her phone, but this page does not contain that denial and page 35 shows her answering yes when asked if she "looked down at [her phone]" and "turned it off," ECF No. 62-3 at 35-36). I thus find that Baker has failed to establish a factual dispute about how she interacted with the phone on February 1, 2017.

she met with a representative from her union shortly after she was terminated. ECF No. 62-3 at 43. Baker then grieved her termination with her union, and the union did not allege discrimination as a basis for challenging the termination decision. ECF No. 65-1 ¶ 24. But Baker now disputes that she was terminated because she violated the Policy, arguing that CT Transit's reliance on Policy violations is pretextual and that she was terminated "because of her race." *Id.* at 5 ¶ 17.

Both of Baker's phone incidents are documented as having occurred "in revenue service." *See* ECF No. 65-4 at 7 (Baker's exhibit 9 where T. B., badge number 1909, had two disciplinary actions for cell phone violation while in revenue service); ECF No. 62-3 at 94 (Baker identifying herself as badge 1909). At oral argument, defense counsel explained, and plaintiff's counsel did not dispute (and does not dispute in the briefs) that a bus is in revenue service when the bus operator is operating the bus and can take on passengers. *See also* ECF No. 62-3 at 70 (Baker stating at her deposition that on February 1, 2017, the bus was "in service," which means that it "can take on passengers"). There is no genuine dispute that Baker's phone use incidents occurred in revenue service. ECF No. 65-1 ¶ 13 (Baker admitting that the photograph depicting her first cell phone incident accurately showed her with "a cell phone in her hand while [she] is seated in the driver's seat of the bus with a passenger coming on board"); ECF No. 62-3 at 35 (Baker answering "yes" when asked if the bus was in service at the time of her second alleged violation of the policy; she was "sitting in the driver's seat" and "had passengers on the bus" while stopped at a red light).[6]

---

[6] Baker disputes in her Local Rule 56(a)2 statement CT Transit's claim that the bus could take on passengers during the February 1, 2017, incident, but this denial is not supported by the evidence she cites. CT Transit's claim is supported by Baker's deposition testimony. ECF No. 62-2 ¶ 21 (citing Baker's deposition testimony, ECF No. 62-3 at 70, where she says that it "was in service," which means that it could "take on passengers"). Baker states that she "did not admit that the bus could take on passengers" when she "took her cell phone out." ECF No. 65-1 ¶ 21. But the three evidentiary citations Baker provides support CT Transit's position. Baker cites page 34 of her deposition, but on that page she answered yes when asked "was the bus in service" and whether she "had passengers on the

### D.        Comparative and Statistical Data

Both Baker and CT Transit submitted comparative and statistical data in support of their arguments about CT Transit's intent when it terminated Baker. Neither party disputes the accuracy of the other's data.

The average percentage of CT Transit bus operators who were African American from 2012 through 2017 was 45%. ECF No. 65-1 ¶ 31. The percentage of involuntarily terminated bus operators who were African American during this period was 45.1%. *Id.* ¶ 32. Of those bus operators terminated for violations of the Policy, "[t]here are no non-African American Bus Operators who were found to have violated the Cell Phone policy twice and were not terminated" from 2012-2017. ECF No. 65-1 ¶ 33. The three bus operators "who were found to have violated the Cell Phone policy twice were African American." *Id.* Two of them were terminated, and one was given a 5-day suspension for his second violation because it occurred while "he was not in revenue service and was approximately three (3) years after his first violation." *Id.*

In the two years preceding Baker's filing of a complaint at the Connecticut Commission on Human Rights and Opportunities ("CHRO"), CT Transit disciplined 17 bus operators for violations of the Policy. ECF No. 65-4 at 3, 5-7.[7] Two operators identified as "Amer Ind/AK Native" each violated the Policy once. #3004 received a 5-day suspension and was warned that

_____

bus." ECF No. 62-3 at 35. Baker also cites page 67 of her deposition, but there again she answers yes when asked "[d]id you have passengers on board." *Id.* at 68. Baker then cites page 69 of her deposition, but this page records Baker stating that, though her bus's door was not open during the February 1, 2017, incident, her bus "was in service." *Id.* at 70. Finally, Baker cites page 70 of her deposition, where she argues with counsel for CT Transit about whether her bus was moving or not and discusses situations where a driver could be stopped and not in service but fails to say anything contradicting her earlier admissions that the bus was in service. *See id.* at 71; *see also id.* at 71-72. Baker has thus failed to raise a genuine dispute about whether her bus could take on passengers and was in service on February 1, 2017, when she removed her cell phone from her pocket.

[7] In this opinion, I identify operators by the badge numbers they are assigned in the document CT Transit produced in response to Baker's CHRO complaint, ECF No. 65-4 at 5-7. Note that some operators, including Baker, are listed in this document more than once.

"another occurrence will result in further discipline up to termination" for "delay[ing] service 8 mins due to cell phone use," and #686 received a 10-day suspension for violating the Policy "while in revenue service." *Id.* at 5-6.

Four operators identified as "Hispanic" each violated the Policy once. *Id.* #3250 received "a 10 day suspension and [was] advised that this was his last chance" and that "[a]nother incident will result in termination" after he used his "cellphone while operating [a bus]." *Id.* at 5. #1745 received a "a written warning for violation of [the] electronic device policy" because he wore "(non-cellphone) headphones while operating [a] company vehicle;" the headphones were not used for a "cellphone purpose." *Id.* at 5. #711 and #568 both received 10-day suspensions for first offense violations of the Policy "while in revenue service." *Id.* at 6.

Five operators identified as "White" each violated the Policy once. *Id.* at 5-6. #914 was given "a 5 day out of work suspension" and advised that "another occurrence will result in further discipline" when he was caught "sitting in the drivers seat . . . using his cellphone at Union Station during a time that he should have been operating the bus." *Id.* at 5. #1483 was given a five-day out of work suspension and "[a]dvised [that] another occurrence will result in further discipline" when service was delayed because he was "using [a] cellphone at the layover for an extended period." *Id.*; ECF No. 65-9 at 2 (discipline letter associated with this entry noted that #1483 received a 10-day suspension for other infractions at the same time as the 5-day suspension for violating the Policy). #619 was given a five-day suspension for improperly using his cell phone "not in revenue service." *Id.* at 6. #636 and #610 both received 10-day suspensions for first offense violations of the Policy "while in revenue service." *Id.* at 6.

Six operators identified as "Black" were disciplined for violating the Policy. *Id.* at 5-7. #3149 received a 5 or 8-day suspension (the admissible evidence disagrees) and was "strongly

advised another cellphone occurrence will result in discharge" when he was observed "standing outside his bus texting for an extended period before taking off from the Travelers." *Id.* at 5 (CHRO data noting 5-day suspension); ECF No. 65-10 at 1-2 (discipline letter stating that #3149 received an 8-day suspension and was disciplined for six policy violations, one of which was violating the Policy). #626 received a 10-day suspension for a first offense violation of the Policy "while in revenue service." *Id.* at 6. #2143 received a 10-day suspension for violating the Policy "while in revenue service." *Id.* at 7. #2140 received a 5-day suspension for improperly using her cell phone "not in revenue service," and then later received a 10-day suspension for violating the Policy "while in revenue service." *Id.* #1909, Baker, received a received a 10-day suspension for a first offense violation of the Policy "while in revenue service" and then was terminated for a second violation of the Policy "while in revenue service." *Id.* And #502 received a 10-day suspension for a first offense violation of the Policy "while in revenue service," then a 5-day suspension for a second violation of the Policy "[n]ot in revenue service," and then was terminated for a third violation of the Policy that was "in revenue service;" the last entry concerning #502 notes, "Termination – 2nd Offense (in revenue svs)." *Id.* at 6.

### E.    Procedural History

Baker filed her Amended Complaint on February 27, 2020. ECF No. 40. On October 15, 2021, this case was reassigned to then-District Judge Sarah A. L. Merriam. ECF No. 60. CT Transit filed its motion for summary judgment on December 1, 2021. ECF No. 62. Judge Merriam held oral argument on that motion on July 7, 2022. ECF No. 68. When Judge Merriam scheduled oral argument, she ordered the parties to prepare to address a few specific issues, including "(1) whether the operative complaint asserts a separate cause of action based on the ten-day suspension imposed in response to plaintiff's first violation of the cell phone policy; (2)

if so, whether any such claim was raised in plaintiff's complaint to the CHRO." ECF No. 67.

After Judge Merriam heard oral argument, she held a status conference on September 15, 2022

and then permitted CT Transit to file a supplemental brief addressing these two issues and,

assuming that the operative complaint did assert an exhausted cause of action based on Baker's

ten-day suspension, discussing whether summary judgment was appropriate for that cause of

action. ECF No. 71. This case was then transferred to me. ECF No. 72. CT Transit filed its

supplemental brief on November 16, 2022; Baker filed her response on December 9, 2022; and

CT Transit filed its reply on December 27, 2022. ECF Nos. 75-77.

## II.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.

Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In

reviewing the summary judgment record, a court must "construe the facts in the light most

favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013). "A genuine dispute of material fact exists for summary judgment purposes where the

evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable

jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d

Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to

any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party

carries its burden, "the opposing party must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358

(2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party

because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted)

## III.   DISCUSSION

### A.   Pleading and Exhaustion Regarding Suspension Claim

I assume without deciding that Baker has stated a properly exhausted claim that her suspension was discriminatory because, as I discuss below, no reasonable jury could infer that Baker's suspension was discriminatory based on the record evidence in this case. I thus need not determine whether Baker stated a properly exhausted suspension claim.

### B.   Suspension and Termination Discrimination Claims

Title VII of the Civil Rights Act of 1964, as relevant here, provides that it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). "An employment decision, then, violates Title VII when it is based in whole or in part on discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (emphasis in original) (internal quotation marks omitted). CFEPA claims are analyzed using the same standards as Title VII claims, so I consider the claims in Counts One (Title VII) and Two (CFEPA) together in this ruling. *Johnson v. Connecticut*, 798 F. Supp. 2d 379, 386 (D. Conn. 2011) ("The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting this provision of the CFEPA . . . [and] this Court will analyze the Title VII claim and the CFEPA claim simultaneously.") (quotation marks omitted).

Race discrimination claims under Title VII are analyzed under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Johnson*, 798 F. Supp. 2d at 386-90 (applying *McDonnell Douglas* burden shifting to race discrimination claims brought under Title VII and CFEPA). Under *McDonnell Douglas*, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Holcomb*, 521 F.3d at 138. "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis*." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) (internal quotation marks omitted). To establish a prima facie case of race discrimination in violation of Title VII, the plaintiff must demonstrate that: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. In determining whether the plaintiff has met her de minimis initial burden of showing "circumstances giving rise to an inference of discrimination," "the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Cronin*, 46 F.3d at 204 (internal quotation marks omitted). "It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Id.* (internal quotation marks omitted).

"If the plaintiff [establishes a prima facie case], the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). Under the second prong of *McDonnell Douglas*, the defendant bears only a "burden of production," not persuasion. *Id.* at 141. "If such a reason is

provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.* at 138. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (internal quotation marks omitted).

In the Second Circuit, courts must use "caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb*, 521 F.3d at 137 (citations omitted). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (internal quotation marks omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.* (citation omitted); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("Summary judgment is appropriate even in discrimination cases [because] . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation") (internal quotation marks omitted). "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). If a plaintiff meets her burden to establish a prima facie case and the defendant satisfies its burden to demonstrate a legitimate, non-discriminatory reason, the plaintiff's ultimate burden of persuasion "may be carried by the

presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence . . . [or] it may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin*, 46 F.3d at 203 (internal quotation marks and citations omitted).

### 1. Prima Facie Case

It is undisputed that Baker has met the first three prongs of a prima facie race discrimination claim under Title VII and *McDonnell Douglas*. She is a member of a protected class because she is African American, was qualified for her job as a bus operator, and was subject to adverse employment actions when CT Transit suspended her and then later terminated her employment. *See* ECF No. 65-1 ¶ 1-5; ECF No. 62 at 14-17 (Defendant not moving for summary judgment on first three prongs). The parties dispute whether the fourth prong of the prima facie case has been satisfied, i.e., whether Baker has met her burden of showing that "the adverse employment action[s] occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. I find that Baker has carried her burden of establishing a prima facie race discrimination case.

With regard to Baker's suspension, CT Transit argues that "[t]here is no example of a non-African American Bus Operator who was found to have violated the Cell Phone policy who was not suspended." ECF No. 75-1 at 17. Then, after reviewing the kinds of evidence Baker did not submit, CT Transit claims Baker has submitted "no admissible evidence to demonstrate that any fellow Bus Operators were treated differently than her with respect to her su[s]pension." *Id.* at 18. With regard to Baker's termination, CT Transit argues that Baker "offers no admissible evidence to demonstrate that any fellow Bus Operators were treated differently than her with respect to her termination." ECF No. 62-1 at 17. It correctly points out that "the undisputed

evidence demonstrates that there are no comparator Bus Operators, who were not African-American, who violated the Cell Phone policy twice who were not terminated." ECF No. 62-1 at 17; ECF No. 65-1 ¶ 33 (Baker admitting that "[t]here are no non-African American Bus Operators who were found to have violated the Cell Phone policy twice and were not terminated"). And CT Transit accurately writes that Baker has offered no evidence that the supervisor who terminated her employment, Josef Rivera, "treated her differently . . . based-on race when he terminated her employment after a second violation of the [P]olicy in February of 2017." ECF No. 62-1 at 17; ECF No. 65-1 ¶ 22 (Baker claiming that Rivera's decision to terminate her was based on race and the Policy violation was a pretext, but not citing any record evidence that Rivera treated her differently when she interacted with him).

Baker's burden to establish a prima facie case is, however, "de minimis." *Cronin*, 46 F.3d at 204. Because "the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (internal quotation marks and alteration omitted). "Circumstances contributing to a permissible inference of discriminatory intent may include the employer's . . . more favorable treatment of employees not in the protected group." *Id.* at 37. Indeed, "[a] showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). "An employee is similarly situated to co-employees if they

15

were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotation marks omitted).

Here, all CT Transit bus operators were required to obey the Policy. ECF No. 62-2 ¶¶ 6, 7, 9; ECF No. 65-1, Plaintiff's Additional Facts ¶ 1. They were thus all subject to the same discipline standards regarding the use of cell phones. The undisputed data in a spreadsheet of similar disciplinary violations submitted by CT Transit as part of the CHRO process ("CHRO Spreadsheet") documents, in the two years preceding Baker's filing of the CHRO charge, 21 comparable incidents where 17 bus operators were disciplined for violating the Policy. ECF No. 65-4 at 5-7; *see id.* at 3 (provided in response to CHRO requirement that CT Transit provide list of "all employees who committed the same or substantially similar offense(s) that the complainant committed"). Although the spreadsheet, which is reproduced in Appendix 1 at the end of this opinion, provides useful information, it does not contain sufficient detail to allow for a determination of whether each operator's Policy-violating conduct was an exact match for Baker's conduct, i.e., having her phone in her hand while operating a bus. A CT Transit witness testified, however, that supervisors have no discretion in the manner in which they apply the Policy to violators. ECF No. 65-1, Plaintiff's Additional Facts ¶ 4; ECF No. 65-5 at 2-3 (Baker's supervisor agreeing that he "had no discretion in giving a first-time violator of th[e] [P]olicy anything other than a 10-day suspension" and had no "discretion to discipline an employee for a second violation in any way other than terminating their employment"); *see* ECF No. 65-1 ¶ 7 (CT Transit submitting as an undisputed material fact the Policy, which contains no discretionary

language). CT Transit's policy required supervisors to punish violations of the Policy uniformly.[8]

The CHRO Spreadsheet reveals that several of Baker's coworkers who were not from her protected class were not disciplined as the Policy, by its terms, required. For example, a bus operator with "Badge #914" identified as "White" was issued a first-time violation punishment of a 5-day suspension and advised that another violation would result in further discipline for "using his cellphone at Union Station" while "sitting in the drivers seat" when he "should have been operating the bus." ECF No. 65-4 at 5. Under the Policy, however, a first-time violator is to be punished with a ten-day suspension and a final warning. ECF No. 65-1 ¶ 7. Similarly, a bus operator with "Badge #619" identified as "White" was given a 5-day suspension for improper use of a cell phone while the bus was "not in revenue service", ECF No. 65-4 at 6, but the Policy does not distinguish between revenue service and non-revenue service and does not provide for 5-day suspensions in any situation, ECF No. 65-1 ¶ 7. While it is true that an African American operator, Badge #2140, also received a 5-day suspension for a violation "not in revenue service," ECF No. 65-4 at 7, Baker need only show that CT Transit treated her "less favorably than *a* similarly situated employee outside h[er] protected group" to contribute to her prima facie case.

---

[8] In her Rule 56(a)(2) statement, Baker resists the notion that she violated the Policy at all, asserting that she "did not use the cell phone but rather took the cell phone out of her pocket to turn it off." ECF No. 65-1 ¶ 19. But her deposition testimony is sufficient to establish a violation of the Policy, as she testified that she removed the phone from her pocket and looked at it while the bus was in service, had passengers onboard, and was waiting at a red light. ECF No. 62-3 at 36, 38, 68-71. The Policy states that phones, like smart watches, should be off and "out of sight and not on [the operator's] person" while the operator is operating a company vehicle. ECF No. 62-2 ¶ 7. Baker admitted that the bus was "in service," which means that it could take on passengers while she was looking at her cell phone in the driver's seat. ECF No. 62-3 at 70. The semantic dispute about whether Baker's conduct could be fairly described as "use" of a phone is not material to this case; Baker violated the Policy because it is undisputed that she held the phone in her hand and looked at it while in the driver's seat of a bus while it was in service stopped at a red light. In any event, Baker does not contest that she violated the Policy in her briefs, and even if she did, the accuracy of an employer's disciplinary determination is immaterial to the critical question of whether it was motivated by discrimination. *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against [the] plaintiff. We are interested in what *motivated* the employer[.]) (internal quotation marks omitted, emphasis in original).

*Mandell*, 316 F.3d at 379 (emphasis added). And "[d]epartures from procedural regularity also

can raise a question as to the good faith of the process that led to an adverse employment action."

*Hettiarachchi v. County of Suffolk*, 14CV6731DLISLB, 2020 WL 5848617, at *7 (E.D.N.Y.

Sept. 30, 2020); *see also Eaton v. Coca-Cola Co.*, 3:06CV01664 (DJS), 2010 WL 2836737, at

*11 (D. Conn. July 19, 2010) ("A decision maker's failure to follow usual company policies or

procedures may be circumstantial evidence supporting an inference of discrimination."class).

Although the Policy refers only to 10-day suspensions for first-time violators, the CHRO

Spreadsheet submitted by Baker contains several examples of bus operators whose first-time

violations of the Policy were disciplined less severely than Baker's. Given that I must resolve all

ambiguities and draw all factual inferences related to the CHRO spreadsheet in Baker's favor at

this stage, I find that she has made the "de minimis" showing needed to carry her prima facie

burden with respect to the ten-day suspension. As for the termination, although Baker has not

identified anyone not in her protected class who was not terminated after violating the Policy

twice, I assume without deciding that she has satisfied her prima facie burden with respect to that

adverse employment action as well.

### 2. Non-Discriminatory Reason

Because Baker has met her initial burden under the first prong of *McDonnell Douglas*,

the burden shifts to CT Transit to produce evidence that it terminated Baker's employment "for a

legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

254 (1981). At this stage, I must determine whether CT Transit has introduced evidence that,

"*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the

adverse action," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original);

"the determination that a defendant has met its burden of production (and has thus rebutted any

legal presumption of intentional discrimination) can involve no credibility assessment," *id*. CT Transit has met this burden by providing admissible evidence that Baker was suspended and terminated for violating the Policy by using her phone on two separate occasions while in the driver's seat of a bus. It provided a written first-offense suspension notice signed by Baker that suspended Baker for using or having a phone in violation of the Policy on November 11, 2016. ECF No. 66 at 10. CT Transit also provided photographs that depict Baker using her cell phone on this date while in the driver's seat of a bus that a passenger was boarding. ECF No. 62-8 at 2-4. It elicited deposition testimony from Baker acknowledging that she received a suspension and final warning notice "for violating the cell phone policy." ECF No. 62-3 at 65. CT Transit then submitted a discharge memorandum dated February 10, 2017, that documented Baker's discharge for using a cell phone "while en route to Port Chester" on February 1, 2017, ECF No. 62-10 at 2, a photograph of this event, ECF No. 62-11 at 2-3, deposition testimony from Baker admitting that on February 1, 2017, she removed her phone from her pocket and manipulated it while operating a bus stopped at a red light, ECF No. 62-3 at 35-36, and a memorandum documenting the result of Baker's appealed grievance for her termination due to violation of the Policy, ECF No. 62-12 at 2-3. This evidence is sufficient to meet CT Transit's burden of producing a legitimate and non-discriminatory reason for suspending Baker and then later terminating her employment, namely that she twice violated the Policy by using a cell phone while operating a bus. To be sure, as noted, Baker points out that the length of her suspension for the first violation differed from that of some non-African American operators, who received shorter suspensions not contemplated by the terms of the Policy. But CT Transit points to language in the CHRO Spreadsheet showing that those who received the shorter suspensions were not "in revenue service," meaning the bus could not accept passengers, at the time of the

violations. Although this distinction is not recognized in the Policy, it is a legitimate, non-discriminatory reason for the difference in the length of suspensions for first-time violators. It is legitimate and non-discriminatory for a transportation company to impose steeper penalties on its drivers for violating its rules when passengers are more likely to be affected by the violation.

### 3. Pretext

Because CT Transit has produced evidence that it acted for a non-discriminatory reason, Baker "may no longer rely on the presumption of discrimination raised by the prima facie case." *Holcomb*, 521 F.3d at 141. Under the third prong of *McDonnell Douglas*, I must ask "whether, without the aid of the presumption, [Baker] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision[s] to [suspend and] fire [her] w[ere] based, at least in part, on the fact that [she is African American]." *Id.* At the third prong, to "defeat summary judgment ... the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (alteration in original) (citation and internal quotation marks omitted). The admissible evidence must allow a reasonable jury to conclude that CT Transit's stated reason for suspending and terminating Baker "was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original). For the reasons discussed below, I find that no reasonable jury could so conclude based on the record before me.

Baker relies primarily on the data from the CHRO Spreadsheet in arguing that she has met her burden of showing a reasonable jury could conclude that her suspension and termination were motivated by racial discrimination. *See* ECF No. 65 at 13-14; ECF No. 76 at 15-16; *see*

20

*also* ECF No. 76 at 10-11 (analyzing patterns in the CHRO Spreadsheet data when discussing the prima facie case). Baker notes that the evidence shows that "there is no discretion under the cell phone policy concerning the discipline of bus operators for violations of the cell phone policy." ECF No. 65 at 13. She then observes that the CHRO Spreadsheet does not reflect that CT Transit enforced the Policy in a nondiscretionary manner. *See id.* (claiming CT Transit "routinely did not follow its own guidelines when disciplining non-African American bus operators for violations" of the Policy); ECF No. 76 at 15 (same). From the combination of these facts, she argues, a reasonable jury could infer that both her suspension and termination were motivated in part by racial animus. Because Baker relies on the same data and information about CT Transit's Policy enforcement activities in arguing that her suspension and termination were motivated in part by racial animus, I analyze her suspension and termination together.[9]

Baker's principal argument is that the CHRO Spreadsheet reveals a pattern in which CT Transit routinely did not follow "its own guidelines when disciplining non-African American bus operators for violation of [CT Transit's] cell phone policy," ECF No. 65 at 13, despite there being no dispute that the language of the Policy is non-discretionary. This argument fails because it relies on misleading excerpts from the CHRO Spreadsheet, and it ignores that CT Transit departed from the literal text of the Policy uniformly as to all racial groups and for a legitimate reason.

"[A] violation of an employer's internal personnel practices is not, by itself, an act of discrimination." *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 319 (E.D.N.Y. 2012).

---

[9] Baker also adopted this approach in her arguments. She declined to make new arguments about her suspension on the third prong of *McDonnel Douglas* when invited to do so in response to CT Transit's supplementary motion for summary judgment on any cause of action related to her suspension. Instead, Baker copied word-for-word her argument from her brief in opposition to CT Transit's motion for summary judgment on the termination cause of action. *Compare* ECF No. 65 at 13-14, *with* ECF No. 76 at 15-16 (briefs contain identical third prong argument sections).

Instead, Baker must "present . . . evidence that any such departure [from the Policy] was due to unlawful discrimination." *Id.* at 320. In the two years preceding Baker's termination, the CHRO Spreadsheet records CT Transit's discipline of two operators identified as "Amer Ind/AK Native" for first-time Policy violations; one operator was given a 5-day suspension because her use of a cell phone delayed service, and the other was given a 10-day suspension for using a cell phone while in revenue service. ECF No. 65-4 at 5-6. Four operators identified as "Hispanic" were each disciplined for a first-time Policy violation. Three of these operators were given 10-day suspensions for using cellphones when operating a bus in revenue service, while the remaining operator received a written warning because he violated the Policy by wearing headphones not connected to a cell phone and "not for [a] cellphone purpose." *Id.* at 5-6. Five operators identified as "White" were each disciplined once for first-time Policy violations. Three of these operators were given five-day suspensions because their cell phone use did not occur in revenue service, while two operators received 10-day suspensions for violating the Policy while in revenue service. *Id.* at 5-6. Six operators identified as "Black" were disciplined for violations of the Policy. *Id.* at 5-7. One operator received a suspension of less than ten days for violating the Policy while not in revenue service as well as five other rules; two operators received 10-day suspensions for violations in revenue service; one operator received a 5-day suspension for a violation not in revenue service and then a 10-day suspension for a second violation in revenue service; one operator received a 5-day suspension for a violation not in revenue service, then a 10-day suspension for a violation in revenue service and, finally, a termination for a second violation in revenue service; and Baker received a 10-day suspension and then termination for two successive violations in revenue service. *Id.*

As already noted, Baker is correct that CT Transit has not enforced the Policy in strict accordance with its terms because the Policy itself does not mention revenue service. But the CHRO Spreadsheet upon which Baker relies reveals a consistent pattern of nondiscriminatory Policy enforcement that distinguishes between revenue and non-revenue service. Violations of the Policy that did not occur in revenue service — i.e., violations that occurred when the bus could not take on and transport passengers — were generally punished with 5-day suspensions. Violations that occurred while the bus was in revenue service were always punished with 10-day suspensions and, in the only cases in which two or more revenue service violations occurred, termination. The record reflects that all bus operators were disciplined consistently and progressively; there is no evidence of an operator being terminated for a first violation of the Policy or not being disciplined in accordance with the revenue service distinction. That distinction, moreover, is reasonably grounded in concerns for passenger safety: when the bus had passengers or could take them on, the risk posed by cell phone use was greater than when the bus was not in service. Although it is not stated in the Policy, the revenue service distinction is a legitimate, non-discriminatory, and consistently applied reason for the disciplinary pattern revealed in the CHRO records. *E.g.,* ECF No. 77 at 4.[10] And the revenue service distinction is reflected in discipline records made at the time of Baker's suspension and termination. *E.g.,* ECF No. 66 at 10 (Baker's suspension notice stating she was suspended for "using [her] cell phone while operating a vehicle in revenue service"). Though CT Transit may have departed from the language of the Policy, when I account for revenue service status, there is no evidence of

---

[10] Baker does not contest the accuracy of the descriptions in the CHRO Spreadsheet as to whether the violation occurred "in revenue service" or not, nor does she suggest that the Court should not rely on the CHRO Spreadsheet because it was prepared by CT Transit in connection with litigation. Indeed, as Baker notes, CT Transit provided the CHRO Spreadsheet as part of its "verified response" to CHRO inquiries, ECF No. 65 at 13, and Baker relies extensively on the document in her briefs. *See, e.g.,* ECF No. 76 at 10, 15-16; ECF No. 65 at 7-8, 13.

procedural irregularity — and no evidence of discrimination — in how Baker's disciplinary incidents were handled relative to other bus operators.[11]

There is also no evidence of a pattern of racially motivated enforcement. All operators who violated the cellphone rules of the Policy in revenue service for the first time received 10-day suspensions, including five African American operators and six operators from other racial groups. All operators who accrued two violations of the Policy in revenue service were terminated. All operators who violated the Policy while not in revenue service received less severe punishments, typically five-day suspensions unless there were complicating circumstances, such as non-cellphone headphone use (#1745 — written warning only, ECF No. 65-4 at 5) or cell phone use along with other rule violations (#3149 — violated six operator rules and received eight-day suspension, ECF No. 65-10 at 1). And the only operator identified in the CHRO Spreadsheet who violated the Policy more than once and was not terminated, #2140, is from the same protected class as Baker and had one in-revenue and one out-of-revenue violation. ECF No. 65-4 at 7. There is thus no evidence that CT Transit's enforcement pattern varied

---

[11] Baker cites the deposition testimony of a defense witness who stated that she did not know why some individuals shown on the CHRO Spreadsheet received five-day suspensions for a first violation while others received ten-day suspensions. ECF No. 76 at 4; ECF No. 65-3 at 7-8. This is insufficient to raise a genuine dispute of fact, however, because the CHRO Spreadsheet itself provides explanations that support the in-revenue-service vs. not-in-revenue-service distinction, *see* ECF No. 65-4 at 5-7, and Baker herself acknowledged that "in service" means that the bus can take on passengers, ECF No. 62-3 at 70. As noted above, it is legitimate and non-discriminatory for CT Transit to impose steeper penalties when a bus is accepting passengers. Similarly, the evidence in the record that there was "no discretion" in enforcement of the Policy, ECF No. 65-5 at 2, is not enough to raise a genuine dispute of material fact either. The evidence concerning "in-revenue service" violations does not suggest there is discretion in enforcement in the sense that decisionmakers exercise judgment or consider the totality of the circumstances in deciding the length of suspension to impose or whether to terminate an employee. Rather, it suggests that the written Policy is supplemented by unwritten but consistently applied practice regarding revenue service violations. Even if this unwritten practice may fairly be characterized as evidence of discretion, it is not suggestive of illegal discrimination. To the contrary, it suggests that discipline was meted out using consistent, non-discriminatory criteria — written and unwritten.

between racial groups or in any other way from which a reasonable juror could infer a discriminatory motive.[12]

Baker ignores the impact of the revenue service distinction on CT Transit's enforcement of the Policy, declining to discuss it in her memoranda in opposition to summary judgment. *See* ECF No. 76 at 10-11; ECF No. 65 at 13-14. Because her discrimination claim relies primarily on comparing the discipline she received to that imposed on employees outside her protected class

---

[12] Baker attempts to convert the disciplinary incidents contained in the CHRO spreadsheets into percentages. ECF No. 76 at 10. But Baker does not indicate how she calculated these percentages, and my review of the CHRO Spreadsheet and other admissible evidence submitted by Baker does not support her calculations. For example, she claims that "20% of non-African Americans received less than a five-day suspension for a first violation." *Id.* But the CHRO Spreadsheet and other record evidence submitted by Baker show only 1 operator of the 11 non-African American operators who received less than a five-day suspension, i.e., #1745, who was wearing "(non-cellphone) headphones" "not for [a] cellphone purpose." ECF No. 65-4 at 5-7.

Indeed, Baker's briefs bristle with inaccuracies and unsourced claims about the CHRO Spreadsheet. She writes that the CHRO Spreadsheet "indicates that a total of 18 employees were disciplined for a first violation" of the Policy "from 2012 through 2017." ECF No. 76 at 3. But the spreadsheet contains entries for only 17 employees, ECF No. 65-4 at 5-7, and contains only data from the two years prior to Baker's 2017 CHRO complaint, *id.* at 3. Baker claims that "eight African-American employees were disciplined for a first violation" of the Policy. ECF No. 76 at 3. But the CHRO Spreadsheet on which she relies for this claim lists only six African American employees (some of whom were disciplined multiple times). ECF No. 65-4 at 5-7. Baker also claims without citation that "[n]o African American employees were given suspensions for a first violation" of the Policy "that included working with pay," ECF No. 76 at 4, but the CHRO Spreadsheet does not contain information about whether suspension days were served as working with pay, *see* ECF No. 65-4 at 5-7. And the only record evidence I could find that shows what proportion of a suspension was served with pay are four disciplinary memos submitted by Baker. ECF Nos. 65-7, 65-8, 65-9, 65-10. But only one of these four memos documents the discipline of an African American bus operator. ECF No. 65-10. These submissions do not establish that no African American employee ever received a suspension that included working with pay.

Even if the percentages and numbers asserted by Baker were supported by the record evidence, they would not allow a reasonable juror to find pretext and infer discrimination. Baker's figures fail to account for the revenue service distinction, which, as shown, provides a legitimate, consistently applied rationale for the differences in discipline imposed by CT Transit. *See* ECF No. 76 at 10. And the sample of 17 employees from which Baker's percentages are apparently calculated is very small, and "[t]he smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it." *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 121 (2d Cir. 1997) (noting that "[a] statistical showing of discrimination rests on the inherent improbability that the [employer's] decisions would conform to the observed pattern unless intentional discrimination was present" and "that discrimination may not be proved by statistics involving" a small sample of eight people, citing cases that found statistics derived from 13-, 10-, and 15- member pools insufficient to infer discrimination). Small samples can also produce percentage differences that appear large even though the underlying variance in the data is small. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002), *as amended* (July 18, 2002) (noting that "[t]he problem with a small number, of course, is that slight changes in the data can drastically alter the result" and affirming grant of summary judgment because statistical evidence was derived from small sample size and unsupported by other evidence of race discrimination). .

who "engaged in comparable conduct," *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (internal quotation marks and citation omitted), her silence on this point is fatal to her claims. Baker does not identify any comparator who violated the Policy for the first time while in revenue service and did not receive a 10-day suspension. *See* ECF No. 76 at 10-11. Instead, she compares her discipline for Policy violations in revenue service to discipline given to non-African Americans for Policy violations not in revenue service, ECF No. 65 at 7-8, claiming this is evidence of discrimination and overlooking that African American employees also consistently received the same, less severe discipline for non-revenue-service violations of the Policy, *see* ECF No. 65-4 at 5-7. Nor can Baker identify a comparator from outside her protected class who twice violated the Policy and was not terminated. Even construing all the record evidence in Baker's favor, no reasonable juror could infer from the data contained in the CHRO Spreadsheet and CT Transit's employment policies that Baker's suspension and termination were racially discriminatory.

Baker also declines to address the remaining record evidence that, even when considered in the light most favorable to her, would prevent a reasonable jury from finding by the preponderance of the evidence that her suspension and termination were racially discriminatory. For example, Baker does not address CT Transit's statistics showing that African Americans were not terminated in disproportion to their presence in CT Transit's workforce. Statistics about the discipline rates of a protected class can be relevant to a disparate treatment claim. *Reynolds v. Barrett*, 685 F.3d 193, 202 n.11 (2d Cir. 2012) (while not sufficient, "[s]tatistics may . . . be used to support an individual disparate treatment claim") (citation omitted); *see Henderson v. City of New York*, 818 F. Supp. 2d 573, 580 (E.D.N.Y. 2011 ("disproportionate number of . . . disciplines . . . issued to minority [employees]" can contribute to an individual disparate

treatment claim if the plaintiff can also provide evidence showing "that he or she in *particular* has been discriminated against," which plaintiff failed to do) (citation and internal quotation marks omitted). In the five years preceding Baker's termination, approximately 45% of CT Transit's bus operators identified as African American and approximately 45.1% of involuntarily terminated bus operators identified as African American. ECF No. 65-1 ¶ 31. These statistics show that African American operators were not terminated in disproportion to their presence in CT Transit's overall workforce, suggesting that CT Transit did not seize on pretextual Policy violations to terminate African American operators for discriminatory reasons.

Baker has thus failed to bear her burden of submitting admissible evidence from which a reasonable jury could infer that CT Transit's stated reason for suspending and terminating her was false and that these actions were instead motivated by racial discrimination. I thus grant summary judgment to CT Transit on her Title VII and CFEPA claims.

## IV.   CONCLUSION

For the reasons above, I grant the motions for summary judgment (ECF Nos. 62, 75) on Baker's Title VII and CFEPA claims. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
          February 27, 2023

27